<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 13-631 (KM) |
| **v.** | |
| **Jamar DARBY** | **OPINION & ORDER** |

<u>**MCNULTY, District Judge**</u>

The defendant, Jamar Darby, pled guilty to a conspiracy to commit multiple armed robberies and is currently serving a lengthy term of imprisonment at FCI Otisville. He has filed a motion (DE 46) seeking compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), citing the danger of a COVID-19 infection, given his preexisting health conditions. The government has filed a response (DE 48), attaching a sealed copy of prison medical records. (Ex. A, DE 48-1. The prison records will be cited herein as "Ex. A".) For the reasons stated below, the motion is denied.[1]

## I.  LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

---

[1]     Section 3582(c) provides that a court may modify a term of imprisonment only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The government concedes that Mr. Darby submitted a request for compassionate to the warden of FCI-Otisville, and that more than 30 days elapsed without a decision. The prerequisite of exhaustion of administrative remedies has therefore been met, and the Court may consider this motion.

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

>> (i) extraordinary and compelling reasons warrant such a reduction; [. . .]

>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D). The application note lists three specific circumstances that the BOP may find extraordinary and compelling, which I summarize:

   a) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the

environment of a correctional facility and from which he or she is not
expected to recover;

b)  the defendant is at least 65 years old, is experiencing a serious
deterioration in physical or mental health because of the aging
process, and has served at least 10 years or 75 percent of his or her
term of imprisonment, whichever is less; or

c)  certain family circumstances exist where the defendant would be the
only available caregiver for his or her minor child, spouse, or
registered partner.

U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing
Commission included a catchall provision, which provides that "other reasons"
may be sufficient if "[a]s determined by the Director of the [BOP], there exists in
the defendant's case an extraordinary and compelling reason other than, or in
combination with, the reasons described in [the enumerated] subdivisions." *Id.*,
Application Note 1(D).

That policy statement was enacted at a time when only the BOP could
consider an application for compassionate release, however, and has not been
amended since the enactment of the First Step Act. In prior cases, I accepted
the emerging near-consensus that where a defendant makes a motion under
the First Step Act, the court is not bound by the application note. The U.S.
Court of Appeals for the Third Circuit, in a precedential decision, has now
joined that consensus:

> The first issue is whether the District Court was bound by
> the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement
> explicitly limits its application to Bureau-initiated motions. Thus,
> according to its plain language, the existing policy statement is not
> applicable—and not binding—for courts considering prisoner-
> initiated motions. In reaching this conclusion, we align with nearly
> every circuit court to consider the issue. *See United States v.
> Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*,
> 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993
> F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516,

3

519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement, while it may limit BOP discretion, does not limit what this Court may reasonably find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.' " *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, —— U.S. ——, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

I therefore am guided by the policy statement, but consider the grounds asserted by the defendant, whether or not specifically authorized by the policy statement. In particular, I consider whether the grounds cited here rise to the level of extraordinary and compelling circumstances, and, if so, whether the purposes of sentencing would nevertheless be unduly undermined if defendant were released.

## II.    DISCUSSION

### A. Extraordinary and compelling circumstances

Mr. Darby's First Step Act application for reduction of sentence rests

primarily on the danger to his health while he is in the institutional setting of
FCI Otisville. He alleges the following preexisting health conditions: obesity,
chronic kidney disease, hyperlipidemia, and prediabetes. He does not claim,
and it does not appear, that these conditions would meet the criteria of the
policy statement, U.S.S.G. § 1B1.13, Application Note 1, cited above. Rather,
he claims that these conditions, when coupled with the danger of contracting a
COVID-19 infection at FCI Otisville, set forth extraordinary and compelling
circumstances warranting his release. I therefore consider (1) the risk, for
someone with Mr. Darby's medical conditions, that a COVID-19 infection would
carry serious consequences; (2) the effect of vaccination on the likelihood of Mr.
Darby's contracting a serious COVID-19 infection; and (3) COVID-19 infection
rates at FCI Otisville.

### 1. Defendant's medical risk factors

Courts, including this one, have routinely looked to the Centers for
Disease Control ("CDC") for guidance as to conditions that place a person at
particular risk of serious consequences from a COVID-19 infection. *See People
With Certain Medical Conditions*, Centers for Disease Control,
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-
with-medical-conditions.html (updated as of April 29, 2022) (cited herein as
"CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than
young persons to suffer serious consequences, and account for some 81% of
COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk
factors for serious consequences, such as hospitalization or death, from a
COVID-19 infection. *Id.*[2]

Certain risk factors may be discounted at the outset. Mr. Darby, aged 35,

---

[2]     The list, in abbreviated form, consists of Cancer, Chronic kidney disease,
Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to
severe"), Dementia, Diabetes, Down syndrome, Heart conditions (and "possibly high
blood pressure (hypertension)"), HIV infection, Immunocompromised state, Mental
health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking,
Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and
Tuberculosis. *Id.*

is not an "older adult," and will not be one at the time of his presumptive release date. Two of the conditions cited by Mr. Darby, hyperlipidemia and prediabetes, do not appear on the CDC List. They are not considered risk factors for serious consequences as a result of a COVID-19 infection. Courts have generally denied compassionate release based on such commonplace, relatively low-risk conditions. *See, e.g., United States v. Thompson,* 984 F.3d 431, 434 (5th Cir. 2021) (denying compassionate release based on hypertension and hyperlipidemia); *United States v. Young,* No. CR 17-413 (SDW), 2021 WL 1961303, at *2 (D.N.J. May 17, 2021) (obesity, asthma, prediabetes, and low white blood cell count, alone or in combination, not sufficient to merit compassionate release).

Obesity, however, does appear on the CDC List as a risk factor. Being overweight (BMI $\geq$25) or obese (BMI $\geq$30), "can make you more likely" to suffer severe consequences as a result of a COVID infection. *See* CDC List. It is undisputed that Mr. Darby has a BMI of 33.4, in the obese but not severely obese (BMI $\geq$ 40) range.

Chronic kidney disease likewise appears on the CDC List. Mr. Darby self-reported with chronic kidney disease, and the prison medical records do refer to "Chronic kidney disease, unspecified." (Ex. A 008, 010) As a "Provisional Diagnosis" the records note "elevated Cr [creatinine] and diminished eGFR [estimated glomerular filtration rate]." (Ex. A 013)[3] Under "Exam comments," the records cite "eGFR-49." (Ex. A 009) The CDC define Stage 3 chronic kidney

---

[3]     There is also a reference to kidney stones (Ex. A 024), but this condition is to be distinguished from chronic kidney disease. *United States v. Leondi*, No. CR 17-527 (SDW), 2021 WL 717361, at 3 (D.N.J. Feb. 23, 2021) ("kidney stones are not equivalent to chronic kidney disease, and the CDC does not suggest that the former condition increases the risk of severe illness from COVID-19."); *United States v. Gjeli*, Crim. No. 13-00421-1, 2020 WL 4432384, at *1 (E.D. Pa. July 31, 2020) (denying defendant's compassionate release because kidney stones are not an extraordinary and compelling reason for his release); *United States v. Mason*, Crim. No. 18-329, 2020 WL 4034835, at *2 (W.D. Pa. July 17, 2020) (denying compassionate release where defendant did not show that his kidney stones "substantially reduce[d] his ability to provide self-care in prison or significantly increase[d] his risk of major complications from COVID-19").

disease as "moderate reduction in kidney function (eGFR 30-59 ml/min per 1.73 m2)." https://nccd.cdc.gov/ckd/help.aspx?section=F#2.[4] Thus the medical record, if not perfectly clear, is consistent with a diagnosis of chronic kidney disease.

In short, the defendant has two ailments that are recognized as risk factors for serious consequences from a COVID-19 infection. I point out, however, that Mr. Darby reported having suffered two earlier COVID-19 infections, from which he recovered, with no permanent or serious consequences noted. (Ex. A 008) Medical records reveal that Mr. Darby has received regular and appropriate care for his various conditions, which appear to be well controlled. Even setting aside other factors such as vaccination, *see infra,* inmates with such multiple chronic, controlled conditions have regularly been denied relief.[5]

---

[4]    Chronic kidney disease is classified on a scale from Stage 1 to Stage 5. I set aside, by the way, any adjustments of eGFR levels for age, sex, and race, an assumption favorable to Mr. Darby's application.

[5]    *See United States v. Coleman*, 848 F. App'x 65, 66 (3d Cir. 2021) (upholding denial of release to inmate with "well managed" conditions of "asthma (moderate-severe), HIV, and hypertension"); *United States v. Pawlowski*, 967 F.3d 327, 330 (3d Cir. 2020) (in pre-vaccine era, denying compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung).

Judge Wigenton has usefully summarized some relevant authority from the voluminous case law:

> Despite the risk of COVID-19, multiple decisions in the Third Circuit, and multiple decisions in this District, have denied compassionate release to inmates suffering from obesity, hypertension, and/or other health issues. *See, e.g., United States v Kenneth Irving Carter*, Crim. No. 21-1090, 2021 WL 4916189, at *1 (3d Cir. Oct. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's severe obesity); *United States v. Patricia Fountain*, Crim. No. 21-1313, 2021 WL 4772957, at *1–2 (3d Cir. Oct. 13, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, concerning blood work levels, high serotonin levels, migraines resulting from adrenoleukodystrophy, cognitive decline, anxiety, depression, panic attacks, and post-traumatic stress disorder"); *United States v. Troy Wragg*, Crim. No. 20-3430, 2021 WL 4459455, at *1, *3 (3d Cir. Sept. 29, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "obesity, seizure disorder, and

## 2. Vaccination

The likelihood of a COVID-19 infection has also been greatly reduced by the vaccination of Mr. Darby and others at the prison.

Prison medical records disclose that Mr. Darby was fully vaccinated against the COVID-19 virus. He received the initial two doses of the Pfizer vaccine, the second administered on April 6, 2021. (Ex. A 032) On November 2 and December 1, 2021, however, he apparently declined a booster. (Ex. A 033–34) I have previously discussed cases in which prisoners were fully vaccinated, and cases in which they refused vaccination; this case, unusually, presents both scenarios.

The available vaccines (Pfizer, Moderna, and Johnson & Johnson) have been shown to be highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less

---

hypertension"); *United States v. Edward Hicks*, Crim. No. 20-3512, 2021 WL 4316829, at *1–2 (3d Cir. Sept. 23, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's "asthma, pre-diabetes, hypertension, and obesity"); *United States v. Tyheed Jefferson*, Crim. No. 21-2020, 2021 WL 4279626, at *1, *3 (3d Cir. Sept. 21, 2021) (affirming District Court decision to deny motion for compassionate release despite defendant's obesity and cryptococcosis); *United States v. Lee*, Crim. No. 13-56, 2021 WL 4077562, at *2–3 (D.N.J. Sept. 8, 2021) (denying motion for compassionate release where defendant suffered from an anxiety disorder and mild hypertension); *United States v. Preschel*, Crim. No. 19-00186, 2021 WL 3930716, at *2, *4 (D.N.J. Sept. 2, 2021) (denying defendant's motion for compassionate release despite suffering from "obstructive sleep apnea, hypertension, diabetes, obesity, depression, and some kind of personality disorder"); *United States v. Germaine H. King*, Crim. No. 18-379, 2021 WL 3783157, at *4, *5 (D.N.J. Aug. 24, 2021) (denying defendant's motion for compassionate release where defendant is suffering from obesity and asthma).

*United States v. Brashear*, No. CR 15-00636 (SDW), 2021 WL 5239119, at *3 (D.N.J. Nov. 10, 2021).

extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarize their effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.**

https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

As a proxy for severity, the CDC report the following hospitalization data:

In February [2022], compared to fully vaccinated persons in each group shown below, the monthly rates of COVID-19-associated hospitalizations were: . . .

**4x** Higher in Unvaccinated Adults Ages 18-49 years

**5x** Higher in Unvaccinated Adults Ages 50-64 years

**6x** Higher in Unvaccinated Adults Ages 65 Years and Older

https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination (last visited May 2, 2022).

There are no guarantees, and breakthrough infections are a reality. It also remains true that the virus develops new variants, requiring that scientific and medical conclusions be revised. Given the current effectiveness of vaccines, however, I have often found vaccination to be a highly relevant consideration in assessing the risks associated with COVID-19 infection. (A recent example is *United States v. v. Jerez Matos*, No. CR 19-113 (KM), 2022 WL 702858, at *3 (D.N.J. Mar. 9, 2022).) *See also United States v. Turbides-Pena*, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) (Chesler, J.) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in

9

sentence."); *United States v. Stewart*, 2021 WL 2134937, at *3 (D.N.J. May 25, 2021) (Wigenton, J.) (noting "with the vaccine's protection . . . Defendant's susceptibility to renewed serious illness seems unlikely"); *United States v. Shumate*, 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (Hillman, J.) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions").

The most recent records furnished to me indicate that Mr. Darby, although fully vaccinated, twice declined a booster in November/December 2021. The Seventh Circuit has taken a strong stance on refusal to be vaccinated, treating it as practically a disqualifier in most cases:

> [A] prisoner who remains at elevated risk because he has declined to be vaccinated cannot plausibly characterize that risk as an "extraordinary and compelling" justification for release. The risk is self-incurred. . . . The federal judiciary need not accept a prisoner's self-diagnosed skepticism about the COVID-19 vaccines as an adequate explanation for remaining unvaccinated, when the responsible agencies all deem vaccination safe and effective . . . . A prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, but, for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release.

*United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021).

One need not fully accept the Seventh Circuit position, however, to find pertinent the observations of the U.S. Court of Appeals for the Third Circuit in a recent unreported case:

> . . . Thomas argues that his request was denied because he received the COVID-19 vaccine and this reasoning, if widely adopted, could perversely encourage inmates to decline the vaccine. We disagree. The District Court appropriately recognized that Thomas's vaccination reduced the health risks he relied on in support of his motion. This conclusion does not reward inmates who decline opportunities for vaccination. District courts routinely deny compassionate release to inmates who refuse the COVID-19 vaccine because they have voluntarily failed to mitigate the very health concerns they identify in support of an early release. *See,*

*e.g., United States v. Brinson*, No. CR 19-153 (SDW), 2021 WL
2451970, at *2 (D.N.J. June 16, 2021) (Wigenton, J.) ("[B]ecause
Defendant was offered and refused the COVID-19 vaccine, he
cannot establish that 'compelling and extraordinary reasons'
justify his release." (internal citations omitted)); *United States v.
Sawyers*, No. CR 15-00070-RSWL-1, 2021 WL 2581412, at *4
(C.D. Cal. June 22, 2021) ("The glaring consensus among district
courts is that refusal of a COVID-19 vaccine subverts a defendant's
compassionate release motion."), *appeal dismissed*, No. 21-50157,
2021 WL 6196971 (9th Cir. Oct. 18, 2021).

*United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1,
2022). In line with these *dicta* in *Thomas,* cases in this district denying
compassionate relief have routinely taken into account a prisoner's refusal to
be vaccinated. *See, e.g., United States v. Manon*, No. CR 16-00460 (SDW), 2022
WL 408958, at *3 (D.N.J. Feb. 10, 2022) ("Despite being offered the COVID-19
vaccine and being "begged" by his medical provider to take the vaccine,
Defendant has refused vaccination. . . . Clearly, Defendant is not in a condition
'that substantially diminishes' his ability 'to provide self-care within the
environment of a correctional facility', as Defendant has rejected the
opportunity for vaccination."); *United States v. Bonilla*, No. 20-0083, 2021 WL
3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an
inmate's refusal to be vaccinated in the absence of a legitimate medical reason
was fatal to establishing an "extraordinary and compelling" reason for
compassionate release).

 A prisoner has the right to refuse vaccination. To my mind such a refusal
is relevant to but not dispositive of the compassionate release application. That
said, I am wary of creating a perverse incentive to forgo vaccination.[6] There is,
moreover, reason to be skeptical of a prisoner who claims to fear for his life, yet
refuses to take routine measures to protect himself against COVID-19
infection. If there were, for example, some particular medical contraindication

---

[6] No reason is given for Mr. Darby's refusal to receive a booster after receiving his
regular vaccinations. I must note that his interrelated applications for release were
pending at the time the booster was offered.

or religious bar to vaccination, I might take that into account, but this record discloses none.

BOP has made the vaccine available to all inmates under its supervision, and has administered over 315,000 doses systemwide. https://www.bop.gov/coronavirus/ At FCI Otisville, 162 staff members and 670 inmates have been fully inoculated.[7] *Id.* Like many a person who refuses vaccination, Mr. Darby nevertheless benefits from the herd immunity of those who did not. Infection statistics bear out that conclusion.

### 3. Infection Rates at FCI Otisville

I move on to consider the current likelihood of contracting COVID-19 at FCI Otisville. That likelihood is low. Many infections occurred, particularly in the earlier period of the pandemic. In early to mid-2021, the prison system brought them under control as vaccines became widely available.

FCI Otisville is a medium security prison and detention center, with an adjacent minimum security satellite camp. Currently the facility houses a total of 575 inmates: 502 in the FCI and FDC, and 73 in the camp. https://www.bop.gov/locations/institutions/otv/ Current and cumulative figures for COVID-19 infections at FCI Otisville are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 3 | 0 | 0 | 339 | 81 |

https://www.bop.gov/coronavirus/

The "recovered" figures reveal substantial numbers of positive COVID test results among the inmates and staff in the past. Thankfully, there were no deaths. Currently, the facility reports zero positive test results among inmates, a far better rate than in society at large, and only three among staff. There is no indication that the risk of COVID-19 would be substantially reduced by Mr. Darby's release.

---

[7]     Currently the facility houses 575 inmates in the prison and adjacent satellite camp. https://www.bop.gov/locations/institutions/otv/ Presumably the figure of 670 vaccinations, which exceeds the current total of inmates, reflects some turnover in the inmate population.

In short, Mr. Darby's personal medical situation, in isolation or in the context of conditions at FCI Otisville, does not support a finding of compelling and exceptional circumstances.

### B. § 3553(a) factors

Even if the circumstances were extraordinary, consideration of the factors under 18 U.S.C. § 3553(a) would weigh against an order of release. *See generally United States v. Doe,* 833 F. App'x 366 (3d Cir. 2020). I have considered the § 3553(a) factors, but discuss them only briefly in light of the analysis above.

The offenses of conviction are serious ones. Mr. Darby pled guilty to a conspiracy including some eleven armed robberies in which he personally participated. The substantive Hobbs Act count to which he pled guilty involved the masked perpetrators' brandishing a handgun, holding it to the head of one of two store clerks, and binding both. These crimes thus involved violence or the fear of violence, and victimized multiple persons.

No surprise, then, that the late William H. Walls, U.S.D.J., took a most stern view of the matter. He imposed consecutive sentences of 141 months and 84 months, for a total of 225 months of incarceration. The BOP currently calculates an estimated release date, assuming all good time credits, of July 23, 2029. Mr. Darby has served approximately just 55% of the likely term of incarceration. The sentence as imposed by Judge Walls was, and remains, necessary to fulfill the goals of just punishment, general deterrence, promotion of respect for the law, and protection of the public. To cut the sentence nearly in half would unacceptably undermine those goals.

This conviction was Mr. Darby's second firearms-related conviction. He also had a history of narcotics and other convictions, as well as personal drug abuse. Such a background suggests a danger of recidivism and the need for individual deterrence.

 The sentence, though harsh, is not disproportionate and does not suggest any untoward disparity. It is, for example, in the lower portion of the calculated Guideline range of 219 to 252 months.

Even if Mr. Darby's circumstances were extraordinary and compelling, which I do not find to be the case, compassionate release would be denied because it would not be consistent with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).[8]

### **ORDER**

**IT IS THEREFORE** this 5th day of May, 2022,

**ORDERED** that the motion for compassionate release (DE 46) is DENIED. The clerk shall send a copy of this opinion and order to the defendant/petitioner, Jamar Darby, by regular first-class mail.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**

---

[8]    To the extent that Mr. Darby may be arguing in the alternative for transfer to home confinement, the application must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion."). And if the court did possess the discretion to award such relief, it would not do so, for the reasons expressed above.